IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA     :
    :
      v.     :   CRIMINAL ACTION NO.
    :   1:11-CR-168-SCJ-CCH-1
DEANGELO TAVARES LANGFORD   :
    :

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

      Attached is the Report and Recommendation of the United States Magistrate
Judge in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's
Criminal Local Rules 12.1(E) and 58.1(A)(3).

      Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the
Report and Recommendation within **fourteen (14) days** of service of this Order.
Should objections be filed, they shall specify with particularity the alleged error(s)
made (including reference by page number to the transcript if applicable) and shall be
served upon the opposing party. *See United States v. Gaddy*, 894 F.2d 1307, 1315
(11th Cir. 1990). The party filing objections will be responsible for obtaining and
filing the transcript of any evidentiary hearing for review by the District Court. Failure
to object in accordance with this rule waives a party's right to review. FED. R. CRIM. P. 59(b)(2).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections are EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.** If objections are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the Report and Recommendation, and the submission to the District Judge, along with any objections, responses and replies thereto. 18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986); *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983). The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

IT IS SO ORDERED this 15th day of March, 2012.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA    :
    :
    v.    :  CRIMINAL ACTION NO.
    :  1:11-CR-168-SCJ-CCH-1
DEANGELO TAVARES LANGFORD  :
    :

## REPORT AND RECOMMENDATION

Defendant Deangelo Tavares Langford is charged in the indictment with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). This action is before the Court on Defendant's Motion to Suppress Statements [15] and Motion to Suppress Evidence [17] (collectively the "Motions to Suppress").

The Court held evidentiary hearings on Defendant's Motions to Suppress on August 24, 2011, and November 8, 2011, and transcripts of the hearings [29][33] were filed on September 29, 2011, and November 21, 2011. Thereafter, Defendant filed a post-hearing brief in support of his Motion to Suppress Evidence [40] on January 24, 2012, and the Government filed a response brief [41] on February 22, 2012. The undersigned granted Defendant's oral request for an extension of time until March 5,

2012, to file a reply brief, but the Defendant did not file any reply. Accordingly, the Motions to Suppress were submitted to the Court for resolution on March 5, 2012.

Having heard the evidence and having reviewed the transcript of the evidentiary hearings and the briefs of the parties, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements [15] and Motion to Suppress Evidence [17] be **DENIED**.

## FINDINGS OF FACT

1. On September 21, 2010, the Atlanta Police Department ("APD") received a 911 emergency call indicating that gunshots had been fired at 2469 Perkerson Road. *See* Transcript of August, 24, 2011 Hearing ("T1") at 22, 57.

2. Officer Keith Backmon was the first officer who arrived on the scene and spoke to the citizen who called 911, who reported seeing a shirtless black man running inside the residence at 2469 Perkerson Road, and stated that the shots fired had come from behind that residence. T1 at 36, 96-97.

3.    Officer Backmon also spoke with another witness, who lived next door to 2469 Perkerson Road, who told him that she had also heard shots and heard screaming inside the house. T1 at 97-98.

4.    The officers on the scene were also advised that someone had called 911 to report that they had heard screaming coming from inside the house at 2460 Perkerson Road. T1 at 135.

5.    Officer Backmon, along with Officer Tabitha Peterson, approached the door to the house and Officer Backmon knocked on the door several times, identifying himself as an Atlanta police officer. T1 at 99.

6.    After Officer Backmon knocked several times, he heard what sounded like the voice of a small child who said "mommy is not home." T1 at 99-100.

7.    Officer Backmon then knocked again and heard the voice of an adult male who said "the owner of the house is not home," but nobody opened the door. T1 at 99-100, 155.

8.    Officer Backmon looked at one of the windows, and observed someone peeping out the window. T1 at 100.

9.  Officer Peterson also observed someone "flick" the blinds, and it looked like "kids' fingers." T1 at 156.

10. By that time, Sergeant Paula Lyons and Lieutenant Frank Zunno had arrived on the scene, and Lt. Zunno advised the other officers to step back while he tried to make contact with the occupants of the house. T1 at 101, 156.

11. Sgt. Lyons informed Lt. Zunno that a shirtless black male had fired a weapon and then ran into the house, and the neighbors had reported screaming coming from inside the house. T1 at 60.

12. According to Lt. Zunno, he had been called to the scene because, based on what the complaining witnesses had reported, it was unclear whether there was a hostage situation or what else was happening in the house. T1 at 59.

13. Lt. Zunno then knocked on the door to the house, identified himself as a police officer and called out that he just needed to "make sure everything is okay in the house." T1 at 59.

14.   At that time, a man, who was later identified as the Defendant Deangelo Langford, opened the door to Lt. Zunno and backed away from the doorway to allow the officers inside the house. T1 at 59, 79.

15.   When the Defendant opened the door for the officers, he was wearing pants and no shirt, and he fit the description of the man who had run into the house that was reported by the witnesses. T1 at 63.

16.   Lt. Zunno told Defendant that he needed to let the officers inside the house "to make sure everyone was safe inside." T1 at 63-65.

17.   Although Defendant seemed reluctant to let the officers into the house, he did allow them into the house, and gave a "nod" to Lt. Zunno when he opened the door and backed away from the doorway. T1 at 65, 80.

18.   Upon their entry into the home, the officers had their weapons holstered. T1 at 67.

19.   Defendant told Lt. Zunno that he did not own the house and was just "staying there," but the woman who owned the house was on the way because he had already called her. T1 at 65, 69.

20.     Defendant also told Lt. Zunno that he was at the house "watching the children."

        T1 at 70.

21.     When the officers entered the home, Lt. Zunno saw that, in addition to

        Defendant, there were four children present, including an infant or toddler who

        was being held by Defendant. T1 at 66.

22.     According to Sgt. Lyons, all the children appeared to be under the age of ten,

        and one young female child was upset and crying. Transcript of November 8,

        2011 Hearing ("T2") at 16.

23.     The officers asked Defendant and the children present to sit down in the living

        room, and the officers conducted a visual sweep of the premises by looking

        inside each room. T1 at 66-67, 82, 89, 104.

24.     After the officers finished conducting the visual sweep and were in the living

        room, one of the children said in front of Office Backmon, "my mommy's

        boyfriend, he put the gun in the attic." T1 at 108-10, 131.

25.    According to Sgt. Lyons, Officer Kempman had also relayed to her that he heard the child say that there was a gun in the attic, and she informed Lt. Zunno about what the child had said. T2 at 17.

26.    Sgt. Lyons also testified that she spoke to the child, who told her that he was scared of getting in trouble if he told. T2 at 17-18.

27.    Lt. Zunno took the child, who appeared to be about 10 or 11, into the kitchen to talk to him because the child indicated that he did not want to talk in front of the Defendant, and the child repeated his statement to Lt. Zunno that there were guns in the attic. T1 at 68-69.

28.    Around that time, Jovanna Whitaker, the mother of the children, arrived at the residence, and she told Lt. Zunno that she was the owner or renter of the house. T1 at 69.

29.    Lt. Zunno informed Ms. Whitaker that the APD had received 911 calls about a weapon being fired at the house, that a man with no shirt had run into the house, and neighbors had heard screaming coming from inside the house. T1 at 70.

30. Lt. Zunno also informed Ms. Whitaker that one of the children had told the officers that there were guns in the attic, and Lt. Zunno had the impression that Ms. Whitaker was not aware that any guns were in the attic. T1 at 70.

31. Lt. Zunno then asked Ms. Whitaker for permission to search the attic for weapons, and told her that if she did not consent to the search, the officers would try to get a search warrant to search the attic. T1 at 71-72.

32. At first, Ms. Whitaker seemed reluctant to consent to the search, but Lt. Zunno told her that he was concerned for the safety of the children if there were guns in the house, and Ms. Whitaker ultimately gave her consent to search the attic. T1 at 72-73.

33. Officer Marvice Smith of the APD was also present at the scene, and, according to Officer Smith, another officer had arrived on the scene with a consent to search form that was given to Ms. Whitaker. T1 at 144.

34. Officer Smith testified that he witnessed Lt. Zunno attempting to obtain the consent to search from Ms. Whitaker, and she said "I know there ain't no gun in here," and as she signed the consent form, she was saying "ain't no gun in here, ain't no gun in here." T1 at 143, 147.

35. Officer Peterson testified that Ms. Whitaker said "I don't see nothing wrong with searching if it is not nothing in there." T1 at 161.

36. Officer Peterson also testified that Ms. Whitaker said to the Defendant, "there better not be no guns or anything up there in the attic." T1 at 162.

37. According to Lt. Zunno, he did not raise his voice at Ms. Whitaker when trying to obtain her consent to search, and she seemed calm and did not indicate that her consent was not voluntary. T1 at 74.

38. Officer Smith also testified that none of the officers were screaming at Ms. Whitaker, and she did not appear upset or crying when giving her consent to search. T1 at 145.

39. According to the testimony of Ms. Whitaker, one of the female officers at the scene told her that if she did not consent to the search, they could take away her children and send them to DFACS, and put her in jail. T2 at 62.

40. Ms. Whitaker also testified that the only thing Defendant said to her at one point before she consented to the search was: "they don't have no search warrant and they can't be doing that." T2 at 63-64.

41.     After Ms. Whitaker signed the consent form, the APD officers conducted a search of the attic and discovered two guns; Officer Smith discovered an AR 15 Carbine assault rifle and Officer Kempton discovered a highpoint handgun. T1 at 75, 146.

42.     When Officers Smith and Kempton came downstairs with the two firearms, according to Officer Backmon, Defendant "blurted out" in front of the officers, "oh, man, the guns was mine," and he also said he did not want to go back to jail because he is a convicted felon. T1 at 114.

43.     Officer Smith testified that Defendant said "the guns are mine, man. I wasn't trying to go back to jail." T1 at 147.

44.     Officer Smith testified that Ms. Whitaker looked surprised at the discovery of the firearms. T1 at 147.

45.     The officers ran an NCIC, ACIC check on the guns and discovered that the assault rifle had been stolen from an officer in Cobb County. T1 at 75.

46.     The officers than handcuffed Defendant and charged him with possession of a stolen weapon and being a felon in possession of a firearm. T1 at 18, 75.

47. Special Agent Jon Judkins of the Bureau of Alcohol, Tobacco, and Firearms, along with Task Force[1] Officer Anthony Hall responded to a call on September 21, 2010, regarding the Defendant's arrest for being a felon in possession of a firearm at 2469 Perkerson Road. T1 at 18.

48. According to Special Agent Judkins, when he arrived on the scene, he spoke with Ms. Whitaker, who told him that Defendant was the father of one of her five children, and he did not live at the residence but only "visited from time to time." T1 at 40.

49. Ms. Whitaker also told Special Agent Judkins that Defendant's name was not on the lease and he did not pay rent. T1 at 40.

50. Ms. Whitaker testified that, although Defendant's name was not on the lease, they "went down the middle with the rent," and she denied telling Special Agent Judkins that Defendant did not pay rent. T1 at 11-12.

51. Ms. Whitaker also testified that Defendant was at her house "occasionally" and he "stayed with [her]." T1 at 12.

---

[1] Special Agent Judkins and Officer Hall were assigned to the Joint Atlanta Police Department Task Force responsible for investigating violent crimes, armed narcotic trafficking, armed career, and felons in possession. T1 at 18.

52.     After Defendant's arrest, on March 29, 2011, he testified at a hearing in the Superior Court of Fulton County, in which he stated under oath that the reason he was present at the residence at 2469 Perkerson Road on September 21, 2010, was because "I came over to baby sit for a couple of hours." Gov. Ex. 7, at 39 (admitted without objection, at T2 at 55).

53.     Defendant further testified that, when the officers arrived on the scene, he told them "this is not my home." Gov. Ex. 7, at 48.

## DISCUSSION

## I.      Motion to Suppress Statements

Defendant originally filed a Motion to Suppress Statements [15] on May 18, 2011, in which he requested an evidentiary hearing to determine whether the alleged statements he made to law enforcement officers were made voluntarily. As noted above, the Court held an evidentiary hearing on Defendant's Motions to Suppress on August 24, 2011, and November 8, 2011, and transcripts of the hearings [29][33] were filed on September 29, 2011, and November 21, 2011. Thereafter, on January 24, 2012, Defendant filed a post-hearing brief in support of his Motion to Suppress Evidence [40], but he failed to file any post-hearing brief in support of his

Motion to Suppress Statements. Furthermore, Defendant's brief addresses only his arguments related to the suppression of the evidence that was discovered on September 21, 2010, and he does not argue that any of his alleged statements should be suppressed on the ground that they were involuntary, or on any other ground.

The Court finds that, based on the evidence in the record, the Defendant's statements were voluntarily made and thus, they are not subject to suppression. *See Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980) (voluntary statements are admissible at trial, even in the absence of *Miranda* warnings). Although it appears to be undisputed that Defendant was not advised of his right to remain silent at any time before he made the statements at issue, the evidence indicates that, when he saw the officers carrying the guns that had been discovered in the attic, he "blurted out" to the officers "oh, man, the guns was mine," and also said he did not want to go back to jail because he is a convicted felon. FOF 42, 43. There is no evidence that he was being subjected to any questioning or interrogation at the time, nor is there any evidence that he was otherwise subjected to any duress or coercion in any way. The undersigned thus concludes that Defendant made the statements voluntarily. *See Williams v. U.S. Dept. of Transp.*, 781 F.2d 1573, 1578 n.6 (11th Cir. 1986) ("[T]he right to the

*Miranda* warnings applies only to interrogation of a person while in custody or 'otherwise deprived of his freedom by the authorities in any significant way.'").

Accordingly, because the Defendant's statements were made voluntarily, and because it appears that Defendant has abandoned his request to suppress his alleged statements, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements [15] be **DENIED**.

## II.    Motion to Suppress Evidence

Defendant argues in his Motion to Suppress Evidence that the two firearms that were seized during the search of the attic at 2469 Perkerson Road on September 21, 2010, must be suppressed from evidence because, he argues, the officers entered the home unlawfully and conducted an unlawful search of the attic. The Court finds that, contrary to the Defendant's arguments, the officers entered the home lawfully as a result of exigent circumstances and performed a lawful search of the attic pursuant to the voluntary consent of Ms. Whitaker.

A.	*The Officers Entered the Home Lawfully*

Defendant first argues that the officers entered the home unlawfully because they did not have his consent to enter the home. The Court finds that the officers lawfully entered the home as a result of the exigent circumstances presented.

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy. U.S. Const. amend. IV; *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Place,* 462 U.S. 696, 706-07 (1983). Accordingly, a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978).

Warrantless searches are *per se* unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions. *Payton v. New York*, 445 U.S. 573, 603 (1980); *Katz v. United States*, 389 U.S. 347 (1967). Because a warrantless search or seizure is presumptively invalid, the burden is ordinarily on the Government to establish by a preponderance of the evidence that a

particular exception to the warrant requirement applies. *Lego v. Twomey*, 404 U.S. 477, 92 S. Ct. 619 (1972); *Vale v. Louisiana*, 399 U.S. 30, 34 (1970). Under the doctrine commonly known as the exclusionary rule, evidence is inadmissible if it is obtained through a search and seizure that is conducted without a warrant and is not subject to one of the specific exceptions to the warrant requirement. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

One important exception to the warrant requirement is when "exigent circumstances" require officers to take immediate action to enter a home for the purpose of protecting the safety of the occupants. *See Michigan v. Tyler*, 436 U.S. 499, 509 (1978). The exigent circumstances exception recognizes a "warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Michigan*, 436 U.S. at 509. The exception encompasses several common situations when obtaining a search warrant is not feasible or advisable, including the risk of harm to the public or police, the threat of danger of flight or escape, loss or destruction of evidence, mobility of a vehicle, and hot pursuit. *See Johnson v. United States*, 333 U.S. 10, 14-15 (1948) (listing situations falling within exigent circumstances exception). The most urgent emergency situation excusing police compliance with the warrant requirement is, of

course, the need to protect or preserve life. *Mincey v. Arizona*, 437 U.S. 385, 392 (1978).

The Eleventh Circuit has held that a 911 call to police indicating that gunshots were fired at a residence results in exigent circumstances supporting the warrantless entry of law enforcement officers into the home for the purpose of discovering if there are any victims that need assistance. *United States v. Holloway*, 290 F.3d 1331, 1338 (11th Cir. 2002). In *Holloway*, the officers received a dispatch from a 911 operator relaying a report of gunshots and arguing, and a second dispatch also indicated continued gunshots and arguing. *Id.* at 1338. Upon arrival at the residence, nothing dissuaded the officers from believing the veracity of the 911 calls, and instead, the presence of the defendant and his wife on the front porch supported the information conveyed by the 911 caller. *Id.* The Eleventh Circuit found that, under the circumstances, exigent circumstances mandated the entry of the officers into the residence to ensure the safety of the occupants:

> Under the circumstances known to them at that time, the officers reasonably believed an emergency situation justified a warrantless search of Appellant's home for victims of gunfire. The possibility of a gunshot victim lying prostrate in the dwelling created an exigency necessitating immediate search. Additionally, based on the information conveyed by the 911 caller and the personal observations of the officers, there was probable cause to believe a person located at the residence was in danger.

> Under the exigent circumstances exception to the Fourth Amendment, the officers were not required to obtain a warrant before entering Appellant's home.

*Id.*

Based on the Eleventh Circuit's decision in *Holloway*, the undersigned finds that exigent circumstances required that the officers in this case enter the home at 2469 Perkerson Road. As in *Holloway*, the officers received a report that gunshots had been fired at the residence; indeed, two separate witnesses had called 911 to report gunshots coming from the residence and one witness reported "screaming" from inside the house. Upon arrival at the home, the officers heard the voice of a small child saying "mommy is not home" and also saw what appeared to be a child's hand moving the blinds at the window. Furthermore, when the Defendant eventually opened the front door to the officers, he was shirtless and fit the general description of the person the witnesses had described as the man who had run into the home after possibly firing gunshots. Under the totality of the circumstances, the undersigned concludes that exigent circumstances required that the officers enter the home in order to ensure the safety of the occupants. Accordingly, the entry of the officers into the home without a search warrant was lawful.

In addition, once the officers were inside the home, they were authorized to conduct a protective sweep of the premises to ensure the safety of the occupants and the officers. *See United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) ("When police enter a home based on consent or another lawful basis, and possess a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene, they may conduct a protective sweep of the premises." (internal quotes and citations omitted)); *United States v. Martins*, 413 F.3d 139, 150 (1st Cir. 2005) ("police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry.").

B.    *The Search was Conducted Lawfully*

Defendant argues further that, even if the officers entered the home lawfully because of exigent circumstances, they did not have probable cause to search the attic, and the search was not conducted with valid consent. Thus, Defendant argues, the search was conducted illegally without a search warrant and the evidence that was discovered must be suppressed. The Court finds, however, that Defendant did not have a reasonable expectation of privacy in the house, and therefore is without standing to standing to object to the search. The Court further finds that the search was conducted

pursuant to a valid consent to search from Ms. Whitaker, who represented herself to the officers as the owner or renter of the house.

1. *Defendant Did Not Have a Legitimate Expectation of Privacy*

To prevail on a claim that evidence was seized in violation of his Fourth Amendment rights, a defendant first bears the burden of demonstrating his legitimate and reasonable expectation of privacy in the areas searched. *United States v. Baron-Mantilla*, 743 F.2d 868, 869 (11th Cir. 1984) (*citing Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)). The legitimacy of a defendant's privacy interest is determined by the totality of circumstances surrounding the defendant's relationship with the place or item searched. *Baron-Mantilla*, 743 F.2d at 870; *see also Rakas*, 439 U.S. at 152 ("The ultimate question . . . is whether one's claim to privacy from governmental intrusion is reasonable in light of all the surrounding circumstances.").

The Eleventh Circuit has held that a suspect who denies any ownership or possession of a property does not have a reasonable expectation of privacy with respect to those premises. *United States v. Sweeting*, 933 F.2d 962, 964 (11th Cir. 1991). In *Sweeting*, the police received two anonymous telephone tips of narcotics activities at a residence, but upon confronting the two suspects at that residence, the

suspects both denied that they lived there and said that their mother rented the house for their grandmother. *Id.* at 963-64. The Government ultimately established that the defendants did live in the house, despite their protests. *Id.* at 964 n.2. Nevertheless, in upholding the district court's denial of a motion to suppress the evidence seized, the Eleventh Circuit stated: "The fact that they had temporary access to the premises along with several other members of their family and had some personal effects there does not establish the requisite subjective expectation of privacy to assert standing when coupled with their explicit disclaimer of ownership or interest." *Id.* at 964.

In this case, Defendant also denied ownership of the house in question and told the officers on the scene that he was just "staying there," and that "the owner of the house is not home," but he had called her and she was on her way. FOF 7, 19. In addition, after Ms. Whitaker arrived on the scene, she also told the officers that Defendant was not on the lease and did not pay rent, and she told Special Agent Judkins that Defendant did not live there and only "visited from time to time." FOF 48, 49. Furthermore, Defendant testified under oath in the state court proceeding that he told the officers on the scene that "this is not my home," and that the only reason he was at the residence on that day was because "I came over to baby sit for a couple of hours." FOF 52.

At the evidentiary hearing in this case, Ms. Whitaker testified that she never told Special Agent Judkins that Defendant did not pay rent. She also testified that, although Defendant's name was not on the lease, they "went down the middle with the rent," and he was at her house occasionally and "stayed" with her. FOF 49-51. The undersigned finds that, in light of the totality of the evidence that Defendant repeatedly denied ownership or residence at the house, Ms. Whitaker was not a credible witness regarding whether Defendant actually lived at the residence. In any event, in light of the decision in *Sweeting*, the undersigned finds that Defendant's repeated denials of any ownership or possession of the property indicate that he did not have a legitimate expectation of privacy with respect to the house. For that reason, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence [17] be **DENIED**.

Furthermore, even if the Defendant had a legitimate expectation of privacy in the house, the undersigned finds that the search of the attic was conducted pursuant to a valid consent from Ms. Whitaker.

2. *The Search Was Conducted Pursuant to Valid Consent*

As discussed above, the Fourth Amendment protects against unreasonable police searches and seizures. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Warrantless searches are *per se* unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions. *Payton v. New York*, 445 U.S. 573, 603 (1980); *Katz v. United States*, 389 U.S. 347 (1967). The Supreme Court has established that "[o]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted).

A search conducted pursuant to consent is not unreasonable so long as the consent is freely and voluntarily given. *Florida v. Royer*, 460 U.S. 491 (1983); *United States v. Tovar-Rico*, 61 F.3d 1529 (11th Cir. 1995). The Government bears the burden of proving that the consent was given freely and voluntarily. *Schnekloth*, 412 U.S. at 248-49. Consent may "not be coerced, by explicit or implicit means, by implied threat or covert force." *Id.* at 228. Whether a consent "was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. Among the

relevant circumstances that may be considered are the person's youth, lack of

education or low intelligence; the lack of any warnings regarding the person's

constitutional rights, and evidence of duress or coercion, such as deprivation of food

or sleep and prolonged detention or questioning. *Id.* at 226. The Eleventh Circuit has

also provided additional factors:

> The determination as to whether a suspect's consent is voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis. *Schneckloth v. Bustamonte*, 412 U.S. at 224-25, 93 S. Ct. at 2046. To assist the lower courts in making their determinations, this court has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found. *United States v. Chemaly*, 741 F.2d at 1352 (quoting *United States v. Phillips*, 664 F.2d 971, 1023-24 (5th Cir. Unit B 1981) (footnotes omitted), *cert. denied*, 457 U.S. 1136, 102 S. Ct. 2965, 73 L.Ed.2d 1354 (1982)).

*United States v. Blake*, 888 F.2d 795, 798-99 (11th Cir. 1989).

In this case, the Defendant does not dispute that Ms. Whitaker was the lawful

renter and resident of the house, and that she had the authority to consent to the

search. Defendant argues, however, that Ms. Whitaker's consent was not freely given

because it was the product of undue coercion and duress. In consideration of the *Schneckloth* factors, and the totality of the circumstances in this case, however, the undersigned finds that Ms. Whitaker was fully capable of giving a free, voluntary, and informed consent to search and that she did so on September 21, 2010, when she gave her consent to search the attic of the residence at 2469 Perkerson Road. There is no evidence that Ms. Whitaker was so young, uneducated, or suffering from such a low intelligence that she was unable to understand the implications of granting consent to search. There is also no evidence that she was subjected to any mental or physical discomfort that would have forced her to give consent under duress. Instead, the evidence reflects that Ms. Whitaker was in her own home and she was not handcuffed or subjected to any other physical restraints at the time she gave her consent to search.

The Supreme Court has recognized that certain encounters with law enforcement are so inherently coercive that a suspect who appears to be expressing consent may be merely "acquiescing to a claim of lawful authority," such that his apparent consent can not be termed voluntary. *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968); *Fikes v. Alabama*, 352 U.S. 191 (1957). The threshold for showing "inherent coercion" is extremely high, however, and courts have found effective voluntary consent in cases in which suspects were faced with a far more

intimidating show of force than was present in this case. *See*, *e.g.*, *United States v. Hidalgo*, 7 F.3d 1566 (11th Cir. 1993) (consent to search was voluntary although the defendant had just been arrested at gunpoint and had invoked his right to remain silent); *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989) (consent to search found voluntary after fourteen armed agents descended on suspect's house and, after being refused unlimited consent to search entire residence, threatened to return with a search warrant); *United States v. Long*, 866 F.2d 402 (11th Cir. 1989) (finding voluntary consent even after the police officers told homeowner that they would be back with a warrant and "dig the place up" if he refused permission to search).

In contrast, the evidence in this case reflects that the officers did not make any threats or coercive statements, such as telling Ms. Whitaker that she had no choice but to consent. The undersigned acknowledges that Ms. Whitaker testified during the evidentiary hearing that one of the female officers at the scene told her that if she did not consent to the search, they could take away her children and send them to DFACS, and send her to jail. FOF 39. In light of the testimony from many of the officers on the scene to the contrary, however, and the inconsistency of Ms.Whitaker's testimony compared to the Defendant's admission in the state court proceedings, the undersigned does not find the testimony of Ms. Whitaker credible. Considering the totality of the

circumstances, the Court finds that Ms. Whitaker's consent to search was freely and voluntarily given and was made without undue force or coercion from the officers.

Furthermore, even if the Defendant did live at the residence with Ms. Whitaker, despite his protests that he was not the owner of the house, the Supreme Court has held that the consent of one occupant is adequate to permit a search of a dwelling, even though there may be other co-occupants who were never asked for their permission. *United States v. Matlock*, 415 U.S. 164, 166-67 (1974). In a more recent decision, the Supreme Court addressed the law of consent as applied to a case in which co-occupants disagree over whether police may conduct a search of a home. *Georgia v. Randolph*, 547 U.S. 103 (2006). In *Randolph*, police asked both a husband and wife for permission to search a house that they jointly occupied. *Id.* at 106-07. The wife consented to the search, but her husband refused. *Id.* The Supreme Court held that the police officer's subsequent search of the house was unlawful because one joint occupant had refused permission to search, and the evidence obtained as a result of the search must be suppressed as to the husband. *Id.* at 122-23.

In holding that "a physically present co-occupant's stated refusal to permit entry prevails" over the permission of a consenting occupant, the *Randolph* Court acknowledged that it was drawing a "fine line." *Id.* at 106, 121. The Court later

reasoned that its holding in the case was practical "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Id.* at 121. This last statement shows that the Court recognized the possibility of manipulation by police eager to obtain consent to search co-occupied dwellings, who might arrest any occupant likely to object to a search, and request consent only from the occupant most likely to give it. The Court was clear, however, that the holding applied only to those co-tenants who were both *present* and *objecting* to the search; the holding did not apply to a co-tenant who was absent or who was present or nearby but not asked for consent or merely silent on the issue:

> [W]e have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door *and objects*, the co-tenant's permission does not suffice for a reasonable search, whereas *the potential objector, nearby but not invited to take part in the threshold colloquy, loses out*.

*Id.* at 121 (emphasis added).

In the instant action, the undisputed evidence reflects that, while Defendant was present during the search, he never expressed any objection to the search, and he never even told the officers that he lived at the house. Indeed, the Defendant testified under

oath in the hearing in the state court proceedings that, when the officers arrived on the scene, he told them "this is not my home." FOF 53. Furthermore, there is no evidence that Defendant ever openly objected to the search. Although Ms. Whitaker testified that, before she signed the consent form, Defendant said to her that "they don't have no search warrant and they can't be doing that," she did not testify that he ever expressly told the officers that he objected to the search. *See* FOF 39. Further, the Court finds that Ms. Whitaker was not a credible witness and that finding applies to this testimony regarding Defendant's advice on the need for a search warrant. The Court thus finds that Defendant was present, disclaimed any residence in the house, and raised no objection to the search.

Under these circumstances and under the Supreme Court's holding in *Randolph*, the undersigned finds that the consent to search obtained from Ms. Whitaker was valid and sufficient to permit a search of that residence. Accordingly, the undersigned finds that the search was conducted lawfully pursuant to a valid consent to search and the evidence seized during the search should not be suppressed.

## RECOMMENDATION

For the above reasons, **IT IS RECOMMENDED** that Defendant's Motion to Suppress Statements [15] and Motion to Suppress Evidence [17] be **DENIED**.

**IT IS SO RECOMMENDED** this 15th day of March, 2012.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE